64 N.J. Super. 167 (1960)
165 A.2d 555
RICHARD ABELES AND JACK I. LEVKOFF, PLAINTIFFS-RESPONDENTS,
v.
ADAMS ENGINEERING CO., INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 10, 1960.
Decided November 21, 1960.
*171 Before Judges GOLDMANN, FREUND and KILKENNY.
Mr. William A. Wachenfeld argued the cause for appellant (Messrs. Lum, Fairlie & Foster, attorneys; Mr. Saul G. Schulter, of counsel; and Mr. Herbert Kelleher, on the brief).
*172 Mr. Howard T. Rosen argued the cause for respondents (Messrs. Jacob and Martin S. Fox, attorneys; Mr. Rosen on the brief).
The opinion of the court was delivered by KILKENNY, J.A.D.
The defendant appeals from a judgment of the Superior Court, Law Division, after a trial, without a jury, awarding the plaintiff Richard Abeles $69,500, as a broker's commission, for obtaining a lender, ready, willing and able to make an institutional loan to the defendant.
The plaintiff Richard Abeles sued as the assignee of the rights of William Atwill, Jr., individually, and his corporation, Atwill & Company, Inc., based upon a written agreement, hereinafter set forth, signed by defendant's president.
One Jack I. Levkoff, a Miami broker, who also rendered services in obtaining the willing lender, joined as a party plaintiff, but his claim was dismissed at the trial because he was not a party to the original agreement or the assignment. Levkoff does not appeal from that dismissal.
The plaintiff cross-appeals for interest on the award from the time of the alleged breach to the effective date of the judgment.
The defendant is a Florida corporation with its principal office in Miami. Charles Silvers is the president of the corporation. He and his family own approximately 89% of the issued and outstanding shares, although the record does not disclose how much of this 89% Silvers personally owns. The remaining 101,251 shares are held publicly by about 400 different stockholders.
The defendant, a relatively new corporation, was interested in obtaining long-term substantial financing. Atwill, one of its directors and a member of defendant's finance committee, and the sole owner of Atwill & Company, Inc., which had underwritten previous stock issues of the defendant, *173 discussed with Silvers the securing for defendant corporation of an institutional loan.
Atwill, who admittedly was not familiar with this type of financing, contacted Levkoff, who, as Atwill was informed, had successfully concluded such loans with insurance companies. Levkoff in turn contacted the plaintiff, Abeles, a Newark broker. Abeles started negotiations with Prudential Life Insurance Company for the desired loan. In the interim, Atwill had informed Silvers that the brokerage fee for obtaining the loan would be 6% to be divided equally among Atwill, Levkoff and Abeles. The latter two did not participate in the fee arrangement with Silvers. Silvers protested at first that the commission was too high, but eventually acceded to a request for a written memorandum to cover the matter. Accordingly, Silvers wrote to Atwill on August 9, 1957 as follows:

"[Letterhead of Adams Engineering Co. Inc.]
 August 9, 1957.
 Mr. William Atwill, Jr.,
 Atwill & Company,
 605 Lincoln Road,
 Miami Beach, Florida.
Dear Mr. Atwill:
This will confirm our telephone conversation of Wednesday, August 7, 1957.
If you are successful in concluding a fifteen-year institutional loan in the amount of $1,600,000.00, upon terms to be mutually agreeable to both parties, this company agrees to pay you a brokerage of six percent (6%) of the amount of the loan.
This fee is to cover all costs, whether legal, filing, recording, accounting, etc.
 Yours very truly
 Adams Engineering Co., Inc.
 /S/ Charles Silvers,
 Charles Silvers,
 President."
Thereafter, several written outlines of loan terms were sent to Silvers by Prudential between September and November *174 1957 which were rejected. However, on November 26, 1957 Silvers approved in writing an outline providing for a loan of $1,250,000 with specified terms and returned it to Prudential. This outline made no mention of any requirement that Silvers take out personal life insurance as a condition to the loan. At this stage the loan was expressly subject to the approval of Prudential's Finance Committee. The Committee decided that the loan as outlined would be acceptable, provided it was further secured by a five-year term, $500,000 life insurance policy on the life of Silvers.
Donald Knab, the Prudential representative in these dealings, thereupon telephoned Levkoff and informed him of the additional insurance requirement. Levkoff testified that he in turn phoned Silvers to notify him of this new life insurance demand and that Silvers replied that it was "okay." This was categorically denied by Silvers in his testimony. There was no written confirmation by defendant although all previous drafts of the proposed loan terms had been in writing.
Silvers testified that he first became aware of the $500,000 life insurance requirement in December 1957, after defendant's lawyer, Clemen Ehrlich, to whom Prudential's first draft of the final loan agreement had been sent for review, informed him thereof. Silvers testified further that at this point he protested this new factor to Ehrlich and instructed Ehrlich to discontinue all further activity in connection with the loan. The loan was scheduled to close December 31, 1957. Silvers' testimony in this regard was corroborated by Ehrlich.
On January 14, 1958, the loan not having closed, a meeting was held in Silvers' office which was attended by Levkoff, Abeles, Knab and Silvers. Levkoff testified that prior to the meeting on January 14, 1958 Abeles had told him that Silvers was not going through with the loan because "he didn't want to take out the life insurance." But Abeles testified that he did not know of this until *175 after that meeting. At this juncture, however, it is clear that Prudential or Knab was not aware of Silvers' unwillingness to agree to the insurance requirement, nor was any mention made of it at the meeting. Silvers claimed that he did not mention it on the advice of Atwill that it would be impolitic and harmful, since Abeles was "going to go over Knab's head" to convince the Prudential home office to remove the objectionable clause. Hence, Silvers merely temporized at the meeting and spoke of other plans.
This resulted in Knab writing a letter to Silvers dated January 15, 1958, referring to the previous day's conference, and to Silvers' having talked about negotiating the sale of his stock in defendant company, and reminding Silvers that Prudential was dealing with the corporation and not with Silvers personally, that Prudential's commitment was firm and they stood ready to make delivery, and that they expected the corporation to perform.
On January 31, 1958 Abeles met Silvers in New York and offered on behalf of the brokers to pay for the insurance premiums. Silvers stated that he would take it under advisement. However, on February 3, 1958, Levkoff informed Knab that the loan application was cancelled. Accordingly, the Prudential loan never closed. Shortly thereafter the defendant obtained financing through another group.
In March 1958 Atwill resigned as director of the defendant corporation and assigned his interest in the brokerage agreement to Abeles alone. The suit by Abeles and Levkoff, as co-plaintiffs, followed.
The trial court's judgment in plaintiff's favor was arrived at by computing 6% of the loan amount of $1,250,000, and from the result of $75,000 deducting the closing costs of an estimated $5,500, since the loan did not close, thereby arriving at the net sum of $69,500.
The defendant urges several grounds for reversal, some of which can be disposed of readily and at the outset as lacking, in our opinion, substantial merit.
*176 The defendant urges that, if the judgment of liability is to stand, the plaintiff's damages should be further diminished beyond the $5,500 legal expenses allowed by the trial court by the $29,100 cost of the insurance premiums over the 5-year term, which would have been payable had the loan in question been concluded with the provision for insurance on Silvers' life. The defendant bases this contention on the brokerage agreement which provided that the commission was "to cover all costs, whether legal, filing, recording, accounting, etc."
Applying the "ejusdem generis rule," we find that the insurance premiums are not in the same class or category as the items enumerated. In construction of laws, wills, and contracts, the "ejusdem generis rule" is that where general words are followed by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned. Black's Law Dictionary, 4th ed. p. 608.
The type of expenses enumerated in the brokerage agreement relates to the normal legal and incidental expenses attendant upon the closing of the loan. The pledge of this life insurance, on the other hand, was not a mere incident to the preparation or execution of the loan. It was collateral security, together with the mortgage that the defendant was to give on its real estate, machinery and equipment. If Silvers died, the funds from the life insurance policy would have reduced the debt by $500,000. The expense of the life insurance was not in the same category of the items enumerated, any more than the interest and expense in paying the mortgage security would be.
Nor do we see any merit in the defendant's argument that the reduction should be made based on the plaintiff's offer to Silvers to pay the premiums after Silvers expressed unwillingness to do so. Assuming that at the time of this promise by the broker, the terms of the loan had been *177 mutually agreed upon and the broker had then fully earned his commission, any gratuitous offer on his part to reduce the amount of the commission would be without consideration and not binding. But, more important, Silvers never accepted this offer.
The defendant contends that the commission never became due and payable because the loan was never consummated. It relies heavily on the use of the words in the brokerage agreement, "If you are successful in concluding a fifteen-year institutional loan * * *." (Emphasis added.) Does this language express a clear and unequivocal condition which supports the defendant's contention?
The word "you" used in the agreement is addressed to the broker. So far as the broker is concerned the only way he could be successful in concluding his portion of the loan transaction would be by arranging a meeting of the minds between the defendant and a ready, willing and able lender. Beyond this the consummation of the transaction was dependent upon the actions of the parties. Contrast the above language with that used in cases where the courts have held that the language used constituted a condition precedent to liability. Illustrative expressions are "we shall be liable only in the event of passing of title," Murray Apfelbaum, Inc. v. Topf, 104 N.J.L. 343 (E. & A. 1928); "said commission to become due * * * upon closing of title," Lippincott v. Content, 123 N.J.L. 277 (E. & A. 1939); "which commission * * * shall be payable if, as and when title actually closes and not otherwise," Alexander Summer Co. v. Weil, 16 N.J. Super. 94 (App. Div. 1951); "this commission is contingent upon the transaction being consummated and in the event that said transaction is not consummated then and in that event no commission shall be payable to said broker," Todiss v. Garruto, 34 N.J. Super. 333 (App. Div. 1955). In our opinion the language used in the brokerage agreement does not clearly and unequivocally create a condition precedent so as to take the broker's right to his *178 commission out of the general rule. See Alnor Construction Co. v. Herchet, 10 N.J. 246, 253 (1952).
That general rule provides that, absent some qualifying or oppugnant expression in the contract of his employment, a broker earns his commission when he produces a person ready, willing and able to comply with the specific terms under which his services were engaged, or other and different terms which are satisfactory to his principal. Bruni v. Posluszny, 56 N.J. Super. 525 (App. Div. 1959); Blau v. Friedman, 26 N.J. 397 (1958); Loeb v. Peter F. Pasbjerg & Co., 22 N.J. 95, 100 (1956); Beckman v. (Zinke's) Rainbow's End, 40 N.J. Super. 193 (App. Div. 1956), certif. denied 22 N.J. 219 (1956); Taylor v. Dorsey, 155 Fla. 305, 19 So.2d 876, 878 (Sup. Ct. 1944); Katz v. Bear, 52 So.2d 903 (Fla. Sup. Ct. 1951); Parrish v. Tyre, 59 So.2d 250 (Fla. Sup. Ct. 1952).
Furthermore, if we assume that the broker had brought the defendant and Prudential into a binding contractual relationship and that the terms of the proposed loan were mutually agreeable to both parties, any wrongful refusal on defendant's part alone to close the transaction would not deprive the broker of his commission. This would be true even if payment of the commission was expressly conditioned upon a closing. For, in such cases, it is implied that the promissor will not prevent the closing by any wrongful act on his part.
One cannot utilize advantageously his own default as an exit of escape from the performance of his contractual obligations. 3 Williston, Contracts (rev. ed. 1936), par. 677, p. 1952; Restatement, Contracts, par. 295, p. 438 (1932). He who prevents a thing from being done may not avail himself of the non-performance which he himself has occasioned. Keifhaber v. Yannelli, 9 N.J. Super. 139, 142 (App. Div. 1950). A contingency clause will not prevent recovery by the broker when the transaction is defeated by the principal's own willful conduct. Blau v. Friedman, supra, at p. 401. At least, this is true in the absence of a clear *179 provision denying the broker a right of recovery where the transaction falls through solely because of the principal's fault. Colvin v. Post Mortgage & Land Co., 225 N.Y. 510, 122 N.E. 454, 455 (Ct. App. 1919); 12 C.J.S., Brokers, par. 95, p. 223 (1938). Therefore, the failure to close the loan in the instant case would not per se deprive the broker of his commission, if that failure were due to defendant's own fault, and if we assume that the broker would otherwise have been entitled to the commission.
Defendant sought a new trial, claiming that there were false representations in the testimony offered in plaintiff's behalf. It alleged that Atwill and the plaintiff had testified that Atwill and his corporation had assigned all their rights in the commission agreement to the plaintiff, Abeles, without any consideration received or promised. Defendant contended that Atwill did have an interest in the commission at the time of trial, so that the representation of no interest deceived the trial judge, who may have evaluated Atwill's credibility at a lower level, but for this representation.
The record does not adequately support this claim of fraudulent testimony. In this respect, we concur in the trial court's decision refusing a new trial on that asserted ground. There is no satisfactory proof that Atwill, or his company, received or was promised any consideration for the assignment. There is insufficient evidence that Atwill or his corporation had, upon making the assignment, any legally binding commitment from the plaintiff for a share in the commission. While there was a concession of a non-binding moral obligation by the plaintiff to give Atwill a part of the commission, and while there may have been some expectancy on Atwill's part in that regard, these facts alone did not spell out a case of fraud in the testimony.
We turn now to more substantial issues raised in the defendant's brief.
It is our opinion that the authorization, evidenced by the letter of August 9, 1957 aforesaid, ran to William Atwill, Jr., as an individual, rather than to his corporation. While *180 there is some ambiguity in the designation of the addressee of that letter, it is significant that it is addressed primarily to "Mr. William Atwill, Jr." Also, the salutation therein is "Dear Mr. Atwill." The reply on the letterhead of Atwill and Company, Inc., signed by its vice-president, acknowledges the letter of August 9 and that it was "read to Mr. Atwill," who was away on a vacation. The third person masculine pronouns thereafter refer to Atwill and are more suggestive of an understanding with Atwill personally than with his corporation. Furthermore, that reply could not unilaterally convert an authorization to an individual into one in favor of his corporation.
In paragraph 2 of his complaint, the plaintiff admits, at least to some extent, Atwill's engagement as an individual, by alleging that the defendant authorized "William Atwill, Jr. and Atwill & Company, Inc., a Florida corporation," to procure the loan. Atwill's individual interest in the agreement is further attested by the fact that the assignment to Abeles was by Atwill, individually, as well as by his corporation. Atwill's equivocal and ambiguous character arises simply because he was the sole owner of Atwill & Company, Inc. Thus, there was at best only a fictional difference between his individual and corporate capacity.
Even the trial court, in its findings and conclusions, referred only to "Mr. Atwill," and never to his corporation. In its opinion, it stated that the agreement was between the defendant and "Mr. Atwill"; the assignment to the plaintiff, Abeles, was from "Mr. Atwill"; and the arrangements were made by "Mr. Atwill" with Levkoff and Abeles.
If it were necessary to invoke the doctrine of "piercing the corporate veil," this would be an appropriate case in which to do it. Justice requires the conclusion that the authorization to procure a lender was to Atwill, the individual, a director of the defendant corporation and member of its finance committee, regardless of any attempt to dress him in corporate clothing.
*181 Hence, we are not concerned with the Florida law and the cases under it which deal with contracts between two corporations, where a person is a director of both corporations. Nor does the fact that the charter of the defendant corporation expressly provides against invalidation of a contract between defendant and any other corporation because of such common directorship have applicability here. In this case, the defendant's contract, if any, was essentially with its own director. That brings into play the legal and equitable principles as to the fiduciary duties and obligations of the director, who has a contract with his own corporation.
It is fundamental that a contract between a corporation and one of its dircetors, entered into without approval of the stockholders, is not enforceable by the director, if it is not fair and reasonable. The burden of clear and convincing proof is on the director to show the fairness of the contract. Orlando Orange Groves Co. v. Hale, 107 Fla. 304, 144 So. 674 (Sup. Ct. 1932); Id., 119 Fla. 159, 161 So. 284 (Sup. Ct. 1933); Chipola Val. Realty Co. v. Griffin, 94 Fla. 1151, 115 So. 541 (Sup. Ct. 1927); 3 Fletcher, Cyclopedia of Corporations, secs. 913 to 921; Ballantine, Law of Corporations, secs. 67 and 70 (1946 ed.). And the rule is the same in New Jersey. Stewart v. Lehigh Valley R. Co., 38 N.J.L. 505 (E. & A. 1875); Eliasberg v. Standard Oil Co., 23 N.J. Super. 431 (Ch. Div. 1952), affirmed 12 N.J. 467 (1953); Hill Dredging Corp. v. Risley, 18 N.J. 501 (1955); Daloisio v. Peninsula Land Co., 43 N.J. Super. 79 (App. Div. 1956). Yet, there is no proof in this case, as plaintiff's attorney admitted on oral argument, that the initial agreement to pay Atwill a 6% commission, or $96,000, for obtaining an institutional loan of $1,600,000 to the defendant, was fair and reasonable. Nor was there, of course, any proof that to pay Atwill a 6% commission, or $75,000, for obtaining a reduced institutional loan of $1,250,000 was fair and reasonable. There was no approval or ratification by defendant's stockholders. *182 In fact, defendant's resistance of the claim thereunder shows an election to avoid it.
We must remember that the defendant did not engage Levkoff and Abeles. Yet these two, who did the lion's share of the work in interesting Prudential in the loan and bringing the loan almost to completion, were perfectly willing to accept a total of 4%, or $50,000, (on the basis of an alleged agreement for a loan in the reduced amount of $1,250,000) for their services. Other than the fact that Atwill contacted Levkoff, the record is barren of any substantial services rendered by Atwill, which would justify even his split of 2%, or $25,000. And these services by Atwill may very well be comprehended within his duties as a director of defendant, and a member of its finance committee.
At one point in the trial, plaintiff's attorney began to ask questions presumably for the purpose of showing that the contract was fair. When the defendant's attorney objected generally and the trial court asked the relevancy of this, plaintiff's attorney withdrew this line of questioning without further ado. The trial court expressed its thought that there was no question about the reasonableness of the 6%, and, though defendant's attorney then indicated there was such a question, the trial court stated: "I cannot see how this can be relevant in this action." This was error. The fairness and reasonableness of the commission was relevant, because of the relationship of the parties to the contract. Thus, there was a failure of necessary proof. The fairness of the 6% commission was not a matter of judicial notice and the trial court did not put its ruling on that basis. In fact, the trial court did not deal with this issue in its conclusions, though it was raised in the answer and expressly called to the attention of the trial court, at the time the court stated its findings. Defendant's attorney then stated "that the Court failed to deal with the question of the fiduciary relationship" between a director and the corporation, and that plaintiff had "failed to prove *183 affirmatively that the agreement was proper and for the best interests of the corporation." Perhaps, the trial court felt that the expression of 6% in the authorization made the inquiry irrelevant. But that is not correct when a fiduciary seeks enforcement of a contract and has the burden of proving that it was fair and reasonable.
In order to hold the defendant liable, it was necessary for the trial court to find as a fact that the defendant had agreed to the $500,000 life insurance requirement. This fact was strenuously denied by the defendant. Without this crucial fact finding, there would be no liability because the agreement required "terms to be mutually agreeable to both parties." In finding that this term had been agreed upon, the trial court supported its conclusion with these words:
"If I did not accept that, it would mean that I would have to find, as I see it, that Mr. Levkoff, Mr. Knab, Mr. Atwill and Mr. Abeles all have extremely faulty recollections, or else have committed perjury and I do not believe that is a possible finding."
Although we are reluctant to disturb the findings of fact of a trial court, we believe that in this case it is necessary for us to exercise our powers in this regard. Under R.R. 1:5-4(b), appellate courts may make new or amended findings of fact, where there has been a non-jury trial court determination, provided due regard is given to the opportunity of the trial court to judge of the credibility of the witnesses. Pratico v. Rhodes, 17 N.J. 328, 335 (1955); Kidde Manufacturing Co. v. Bloomfield, 20 N.J. 52, 66 (1955); State v. H.L., 61 N.J. Super. 432, 437 (App. Div. 1960); Graham v. Onderdonk, 33 N.J. 356 (1960). In doing so, we observe that:
"Testimony to be believed must not only proceed from the mouth of a credible witness but must be credible in itself. It must be such as the common experience of mankind can approve as probable in the circumstances."
In re Perrone's Estate, 5 N.J. 514, 522 (1950).
*184 We disagree with this fact finding and with the reason assigned by the trial court. The record supports the proposition that it was not necessary to find that all those named above committed perjury or had extremely faulty recollections to avoid the court's conclusion. An analysis of the testimony of those named on this crucial factual issue will so demonstrate.
Atwill did not know of the insurance requirement until sometime in January 1958, when at the same time he heard that Silvers was objecting to it. Certainly this furnishes no affirmative proof that assent had been given to this term. Yet, Atwill was a director of the defendant, a member of its finance committee, and a party to the agreement upon which this action is grounded. Obviously, it is not necessary to find any perjury by, or faulty recollection in, Atwill to reach the conclusion that the insurance had not been agreed upon, or even presented to him as a member of the board of directors.
Knab's testimony contains no admissible affirmative proof that Silvers had agreed to the insurance provision. Knab never received any personal verification of this fact from Silvers or the defendant, either orally or in writing. He never wrote or phoned Silvers to check the fact. Yet, from the moment the insurance was first set forth in Prudential's draft agreement with Silvers, and Silvers learned thereof from his attorney, he refused to agree to it. Knab's only purported knowledge, therefore, that Silvers had agreed to this item was the hearsay phone report to him thereof by Levkoff. In fact, Knab swore that the first he knew about the insurance complaint was in May 1958. Thus, it is not necessary to find perjury or faulty recollection in Knab. At the same time, Knab's testimony does not prove that Silvers agreed to the insurance, but only that Levkoff told him so, and this out of the presence of Silvers, so that it furnished no binding admission. Such hearsay is not competent proof of the fact reported.
*185 Nowhere in the testimony of Abeles is there any statement by him of any writing or conversation between him and Silvers, in which Silvers admitted or confirmed that he had agreed to the insurance requirement. On the contrary, Abeles' testimony throughout verifies Silvers' unwillingness to submit to that term and points up his efforts to save the deal from collapse by offering to pay the insurance premiums out of the broker's commission. Abeles' knowledge of the insurance item came from the Southern office of Prudential, where he tried to get them to waive the requirement; and from Levkoff, who allegedly told him that Silvers had approved. But this again was objectionable hearsay evidence insufficient to support a determination that Silvers had in fact agreed. Abeles admitted that he did not speak to Silvers about it until he made his offer of compromise on January 31, and that he "never" heard any complaint about the insurance until sometime between January 16 and 31. So again, even if Abeles' testimony was true and his recollection not faulty, it would not necessitate the conclusion that Silvers had agreed to the insurance feature. It established at most that Levkoff told Abeles so, out of the presence of Silvers; and that when Abeles first spoke with Silvers, the latter confirmed that he was not willing to accede to the insurance provision.
That left Levkoff as the only person mentioned by the trial court whose testimony could justify the fact finding. We agree that as to Levkoff the trial court would have to find that either he had an extremely faulty recollection or committed perjury. This follows because his testimony that Silvers agreed to the insurance term orally over the telephone is categorically denied by Silvers under oath. That Levkoff was possessed of at least faulty recollection is demonstrated in the record, simply by comparing his testimony with that of the plaintiff and other witnesses for the plaintiff.
For example, Levkoff swore that he first learned from Abeles that Silvers was unwilling to go through with the loan because of the insurance requirement; and that this was prior to the January 14 meeting. Yet Abeles was positive *186 in his testimony that he did not know of this objection by Silvers until after that meeting, sometime between January 16 and 31. When Abeles' attention was directed to this discrepancy between his testimony and that of his witness, Levkoff, he stated: "I heard him [Levkoff] say so but it was wrong." At another point in his testimony, dealing with the same inquiry, Levkoff swore that it was shortly after New Year's, sometime after January 5, when he first learned that Silvers objected to the insurance. Continuing, he testified:
"I heard from Mr. Atwill. He told me that Mr. Silvers objected to the insurance." (Emphasis added)

* * * * * * * *
"I think it was right about that time [January 14]. I don't recall whether it was just before or after."
At still another point, Levkoff swore that it was "sometime in January I had a call from Mr. Knab." (Emphasis added) And later testified as to the same call, "it could have been" February 26. It may again be noted that Knab testified that he received no notice of Silvers' complaint about the insurance until May, 1958. The foregoing is clearly illustrative of Levkoff's "extremely faulty recollection," which the trial court could have reasonably found to avoid its conclusion that Silvers must have agreed to the insurance provision.
Moreover, the incredibility of Levkoff's assertion that Silvers, a businessman, without inquiry as to cost, simply said "okay," when informed by telephone of the insurance requirement requires, in the light of the surrounding circumstances, that it be disbelieved. The prior insistence upon written outlines of the terms, the fact that the agreement upon this insurance clause was never obtained in writing, the concern of the brokers in December 1957 and January 1958 as to whether the deal was going through, the willingness of the brokers to deduct from their commission the substantial amount of the insurance premiums, Abeles' efforts to have the requirement waived even before he spoke *187 with Silvers, the absolute denial by Silvers, his attorney's confirmation that Silvers objected as soon as the clause appeared in the first draft of the loan agreement and was called to his attention,  all these factors greatly outweigh Levkoff's solitary, uncorroborated assertion that Silvers had given his "okay" over the telephone. This disputed assent, incidentally, was never presented to defendant's board of directors for approval.
The conclusion is irresistible that the plaintiff has failed to prove by a preponderance of the credible evidence that the life insurance provision had been agreed to by Silvers or by the defendant. Absent a meeting of the minds of Prudential and defendant on that additional loan requirement, the condition of "mutually agreeable" terms, expressed in Silvers' letter to Atwill, was never satisfied. Accordingly, the defendant is not liable to Abeles, as assignee of Atwill. The rights of an assignee can rise no higher than those of his assignor. All defenses available against Atwill at the time of the assignment are available against his assignee, Abeles. Brooklawn v. Brooklawn Housing Corp., 129 N.J.L. 77, 79 (E. & A. 1942); 1 Restatement, Contracts, sec. 167(1).
The defendant also urges as a ground for reversal that the agreements involved are not binding, because not authorized by its stockholders or directors, and not entered into by any duly authorized agent of the defendant corporation. It raised this issue specifically in the first separate defense in its answer. In the pretrial order, it was not pointedly delineated as one of the issues, although it might be embraced within the broad issue of "legality of contract." Defendant did not press the issue of lack of authority vigorously at the trial, either by the offer of any evidence negating authority, or by including it as a stated ground in its motions for dismissal. Likewise, the plaintiff gave this matter scant attention at the trial. As a result, the record is almost barren of evidence on this question. No corporate minutes, resolution, charter, or by-laws were produced *188 by either side to prove or disprove any express or implied authorization to make the agreements. We must assume there was no such proof.
We know that Silvers, who signed the agreement, was the president, that he and his family owned 89% of the shares, and that the remaining 101,251 shares were owned by over 400 other persons. Beyond this, we have only Atwill's testimony that Silvers "managed the company completely," that he was "the main show"; and Levkoff's testimony that Silvers "ran the company and everybody took orders from Mr. Silvers." Apparently, directors' meetings were held. Atwill refers to one on December 17, 1957, called to unwind a stock conversion. No mention was made at this meeting of the Prudential loan or the insurance requirement. Obviously, the insurance feature was never submitted to the directors for consideration, even though it would have entailed a corporate expense of $29,100 for premiums. The trial court made no reference to the issue of Silvers' authority in its findings and stated no conclusion expressly thereon. Hence, we shall exercise the power vested in appellate courts by R.R. 1:5-4(b) and make our own findings.
Since a Florida corporation and contract are involved here, we shall apply Florida law, wherever it conflicts with our own. The only conflict brought to our attention is the more liberal Florida rule which presumes authority to bind the corporation "in the case of acts of the president in the ordinary course of business." 2 Fletcher, Cyclopedia Corporations (rev. 1954) sec. 566, p. 640. This presumption has been liberally extended in Florida in cases involving the sale of corporate lands and the appointment of agents to sell such lands, even though real estate corporations as such were not involved. Jacksonville American Pub. Co. v. Jacksonville Paper Co., 143 Fla. 835, 197 So. 672 (Sup. Ct. 1940); McGhee Lumber Co. v. Tomlinson, 66 Fla. 536, 63 So. 919 (Sup. Ct. 1913); Skinner v. Douville, 54 Fla. 251, 44 So. 1014 (Sup. Ct. 1907).
*189 A loan of $1,250,000 by an insurance company to the defendant, an engineering company, with complex terms of repayment as the several outlines suggest, secured by a mortgage on defendant's real estate, machinery and equipment, and further backed by the disputed 5-year term, $500,000 insurance policy on the life of the borrower's president, is clearly not a transaction "in the ordinary course of business." We have been referred to no Florida case in which the president's presumed authority has been extended to such an extraordinary and involved corporate deal. We presume that Florida law is in accord with our own in cases of extraordinary corporate business, such as this.
Under our law, a single director or officer, including the president, virtute officii, has no authority to bind his corporation. Titus & Scudder v. Cairo, etc., R. Co., 37 N.J.L. 98 (Sup. Ct. 1874); Hudson Co-op Loan Ass'n v. Horowytz, 116 N.J.L. 605 (Sup. Ct. 1936); Elblum Holding Corp. v. Mintz, 120 N.J.L. 604 (Sup. Ct. 1938); Knopf v. Alma Park, Inc., 105 N.J. Eq. 299 (Ch. 1929); Donohue v. Nash Sales Corp., Inc., 5 N.J. Misc. 692, 137 A. 891 (Sup. Ct. 1927); Iback v. Elevator Supplies Co., 118 N.J. Eq. 90 (Ch. 1935); Gabriel v. Auf der Heide  Aragona, 14 N.J. Super. 558 (App. Div. 1951). Especially is this so when the act is not "usual to his office," or within "the usual course of business." Beach v. Palisade Realty, etc., Co., 86 N.J.L. 238 (E. & A. 1914); Stammelman v. Interstate Co., 111 N.J.L. 122 (Sup. Ct. 1933), reversed on other grounds 112 N.J.L. 342 (E. & A. 1933). This is true even if the director owns a majority of the corporate stock. Clement v. Young-McShea Amusement Co., 70 N.J. Eq. 677 (E. & A. 1905); Hill Dredging Corp. v. Risley, 18 N.J. 501 (1955). The board of directors must authorize or ratify the act of its director or officer. In so doing, they must be lawfully assembled and must act as a board. Moffatt v. Niemitz, 102 N.J. Eq. 112 (Ch. 1928); Holcombe v. Trenton White City Co., 80 N.J. Eq. 122 (Ch. 1912). The mere fact that it is a so-called "family *190 corporation" does not ipso facto give the president, or any other officer or director, the power to bind the corporation by his unauthorized and unratified act. Yeskel v. Murray Holding Co., 140 N.J. Eq. 195, 198 (Ch. 1947).
The burden of proving authority in the corporate officer is upon him who asserts it. Even under the Florida rule, the presumption is not conclusive. One dealing with a corporation may not assume with safety that the officer is acting within his authority. Johnson v. Eday Fabrics, Inc., 121 N.J.L. 504 (E. & A. 1928). The mere statement of an officer that he had such authority is not enough. Sattler v. Howe Rubber Corp., 98 N.J.L. 460-463 (E. & A. 1923). The ability of an officer to bind his corporation is governed by the principles of the law of agency. Ross v. Realty Abstract Co., 50 N.J. Super. 147, 154 (App. Div. 1958). Thus, we are warned in Carlson v. Hannah, 6 N.J. 202, 212 (1951):
"The authority of an agent to manage a business extends no further than the direction of the ordinary operations of the business, including authority to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it." (Emphasis added).
See 1 Restatement, Agency 2d, sec. 73, p. 189 (1958). Mere proof that Silvers "managed" the defendant did not constitute apparent authority to arrogate to himself the powers of the board of directors.
We adopt for this case the following language appearing in Myrtle Ave. Corp. v. Mount Prospect B. & L. Ass'n, 112 N.J.L. 60, 64 (E. & A. 1933):
"The making of the contract was not authorized by the corporation, either expressly or by implication. It was not within the incidental or the apparent powers of the president. It was not in the usual course of business of the corporation. We are brought to the conclusion that the president was without authority to make the agreement which he undertook to make and upon which the plaintiff sues."
*191 In summary, there are three reasons why the judgment below must be reversed, viz.: (1) the plaintiff did not establish by a fair preponderance of the evidence that defendant had agreed to Prudential's added requirement of a $500,000 insurance policy on Silvers' life; (2) plaintiff adduced no proof showing that the purported agreement between the defendant corporation and its director, Atwill, was fair and reasonable; and (3) plaintiff did not sustain his burden of proof that Silvers had the authority to bind the defendant corporation by his agreement with Atwill, or the disputed agreement with Prudential.
In view of our holding that the plaintiff is not entitled to the claimed commission, it becomes unnecessary to consider plaintiff's cross-appeal in which he sought interest on the award.
Accordingly, the cross-appeal is dismissed and the judgment of the trial court is reversed.