201 N.J. Super. 156 (1985)
492 A.2d 1062
JOSEPH HILTON & ASSOCIATES, INC., PLAINTIFF-APPELLANT,
v.
JOHN H. EVANS AND BARBARA W. EVANS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted March 11, 1985.
Decided May 13, 1985.
*158 Before Judges KING, DEIGHAN and BILDER.
*159 Wolff & Samson, attorneys for appellant (Ronald E. Wiss, on the brief).
Pitney, Hardin, Kipp & Szuch, attorneys for respondents (Richard L. Plotkin and Peter M. Laughlin, on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
Plaintiff appeals from a judgment of dismissal of its complaint for real estate broker's commissions. The trial judge, sitting without a jury, entered judgment for defendants owners on the ground that the written memorandum did not specify that a commission would be paid if the property sold for less than the $1,200,000 list price. He held that in absence of such writing, the Statute of Frauds barred recovery on the ground of either express contract or quantum meruit.
The precise question before us is whether, under the facts and circumstances of this case, plaintiff real estate broker is entitled to a commission on the sale of real estate where the buyer and seller signed an agreement and consummated the sale for a lesser selling price than that authorized by the seller in his written memorandum to the broker. We hold that the broker is entitled to a commission and reverse the judgment below.
Sometime prior to March 17, 1980, Robert McCafferty, a licensed real estate salesman employed by plaintiff, contacted defendant John Evans (defendant when used in the singular), also a licensed broker, concerning the sale of defendants' property located in Chatham. A few months after defendants expressed an interest in selling their property, McCafferty obtained an interested prospect, United Research, through another broker, Dick Ward.
On March 17, 1980 at a meeting with McCafferty, defendants agreed that plaintiff could offer their property for sale for $1,200,000 and agreed to pay a brokerage commission of 10% upon closing. On the same date McCafferty wrote to defendant *160 to confirm the commission arrangement made that day. In pertinent part the letter stated:
We agree to offer your 14.2 acres and the improvements thereon as agents to the single prospect discussed at a price of $1,200,000 gross. Our commission will be 10% of the price payable at closing or, depending on the final terms of sale, over a period not to exceed three years together with interest at a rate cominsurate [sic] with that of the purchase money mortgage.
McCafferty requested defendants to sign and return the letter if it conformed to their understanding of the agreement at the meeting on March 17, 1980.
Defendant did not sign the letter nor did he make any immediate response. Ten days later, on March 26, 1980, he wrote a note to his wife stating that the proposed sale price represented four times their investment and there was "no harm in exploring." He also wrote: "Commission of 10% means an agreement at $1,200,000 only! Anything less, then commission is negotiable (but you don't say that to start)." At trial, defendant testified that he had told McCafferty that he and his wife wanted to clear one million dollars from the sale and that a sale price of $1,200,000 would enable him to accomplish this. McCafferty and Ward were aware of this.
On April 10, 1980 defendant responded to McCafferty's letter of March 17. In his letter defendant, among other things, stated:
The offering price of $1,200,000 is correct for this single instance and a ten percent commission on that price is agreeable but under no circumstances would we pay any interest on the terms of payment of any commissions. I have not interposed myself as a broker in this matter and would expect not to do so.
Defendant also discussed possible terms of financing and then further stated:
As we indicated to you the matter of a sale comes prematurely to us but we feel that it would be foolhardy of us not to consider any legitimate proposal.
This letter is the principal basis upon which plaintiff seeks a 10% commission.
United Research lost interest in the property but Ward found another prospective buyer, Trans World Radio (Trans World). Defendant first learned of Trans World's interest in the property *161 on August 6, 1980 when it inspected the property with McCafferty. On the same date McCafferty sent a written notice to defendant which stated:
Confirming our conversation of this date please be advised that I have offered your Shunpike Road property, in its entirely [sic], to Trans World Radio, of Chatham on the same terms and conditions as outlined in my letter of March 17, 1980 and your response of April 10, 1980.
Defendant confirmed plaintiff's authority to offer the property and responded by typing the following reply at the bottom of McCafferty's letter:
FOR SOME REASON I HAVE MISPLACED OUR CORRESPONDENCE, WOULD APPRECIATE YOUR SENDING ME A COPY OF THE TWO LETTERS MENTIONED ABOVE. THIS WILL SERVE TO ACKNOWLEDGE THE TRANS WORLD RADIO INTRODUCTION.
On August 11, 1980 Trans World submitted an offer through McCafferty to purchase the property for $1,100,000. The offer was conditioned on obtaining certain land-use approvals and other contingencies which were acceptable by defendants. The subject of the commission was discussed during a meeting in August. McCafferty suggested that the commission agreement be included in the sales contract but defendant insisted that the commission be dealt with by a separate agreement. On September 16, 1980 defendants and Trans World signed the agreement of sale for the property at $1,100,000.
After signing the contract, Trans World procrastinated in obtaining the necessary land-use approvals. At defendant's request McCafferty and Ward took an active part in expediting the approvals. In addition to working with the lawyers, architects and engineers to prepare the necessary material, Ward attended many other meetings in processing the approvals.
A year later, in September and October of 1981, defendant made several notes to himself and his attorney regarding the financial aspects of the transaction with several references to the broker's commission. In a memo to his attorney, George Mahr, defendant contemplated the alternatives if the sale fell through and his financial position if the sale was completed. Among other things, that note recited a commission of $100,000 *162 or 10% to the broker. He assumed that at worst he would be required to pay a commission on 10% of the sale.
In a memo to himself defendant noted that he needed "additional cash at closing to discharge broker." In another memo prepared late September 1981, defendant indicated he needed "$100,000 additional cash at closing to discharge broker." He explained at trial that he thought he would need that amount of money to pay the commission. Finally, in another memo to himself defendant listed the sales price at $1,100,000, under which he noted a commission of $100,000 which he crossed out and substituted the number $80,000 and 7 1/2%. At trial he explained that this was his opinion of an appropriate broker's commission if title closed. He further testified that although he knew that the brokers expected a commission of 10% of the $1,100,000 sales price, he never suggested any lesser commission because the property sold under the $1,200,000.
On November 23, 1981 defendant wrote a letter to McCafferty to resolve the commission question before the impending closing. He told McCafferty that he was "unable to pay commission at the closing" and was writing the letter "to be used as a basis for exploring alternative solutions to the problem which Barbara and I are now faced with." Generally, these problems consisted of the financial obligations defendants incurred as a result of the delay in closing the transaction, including payment of interest on another loan which they had taken out, apparently to purchase another property.
The letter resulted in a meeting on November 25, 1981 between McCafferty, Ward and defendant. The amount of the commission was not discussed by defendant but he indicated that he would not have sufficient funds to pay a commission. He requested Ward to try to get additional cash from Trans World. He needed an additional $50,000 and said he would "be able to pay you roughly a third of your commission or $40,000 of your commission at the time of closing and the balance over a period of 18 months." There was also a discussion at this *163 meeting concerning interest on the balance of the commission, McCafferty insisting on interest and the defendant refusing to pay any interest. Subsequently, McCafferty relinquished his demand for interest on the commissions payable in installments. Ward and McCafferty persuaded Trans World to pay an additional $50,000 in cash at settlement.
Defendant indicated that he was very satisfied with the additional $50,000. Although defendant denied that there was an agreement as to the total amount of commissions to be paid, there was no dispute that the $40,000 would be paid at settlement and the balance would be paid in installments. At trial defendant stated:
That I felt I could pay perhaps at closing up to $40,000, that it would be my hope that if everything were to resolve satisfactorily and beneficially, that I might be able to pay whatever balance remained in a shorter period of 18 months.
Sometime prior to settlement defendants' attorney, Mahr, offered to settle the commission problem by a lump sum payment of $60,000 which McCafferty declined. At the attorney's request McCafferty sent a letter to the attorney outlining his terms for payment for settlement of the commission. Accordingly, on December 4, 1981, McCafferty sent the following note to defendant.
I met with George Mahr and he requested that a letter be prepared and signed by yourself, Dick Ward and myself relative to the above.
Dick Ward and I agree that we will take the $110,000 commission as follows, forty ($40,000) dollars at closing and sixty ($60,000) in three equal installments of twenty $20,000 each payable six, twelve and eighteen months from closing.[1]
In addition, if Trans World prepays the note for any reason or makes a release payment we would expect to receive our pro rata share of those payments when they are made and apply them toward the next due payment under our agreement.
We would also like our payment schedule secured by the Trans World note from you.

*164 If you find this acceptable please advise George Mahr to prepare the necessary documents. If it is not, let us know.
Insofar as McCafferty and Ward were concerned, the letter accurately summarized the agreement reached with defendant on a meeting held on November 30, 1981. However, defendant viewed the letter as a proposal.
The closing took place on December 7, 1981. That afternoon Mahr offered $75,000 to settle the matter of the commission but the offer was rejected. On December 17, 1981, plaintiff sent a bill for the commission which demanded $40,000 immediately and the balance in three equal installments of $23,333.33 payable six, twelve and eighteen months from the date of the closing.
In holding for defendant, the trial judge reasoned that there was no written commission agreement dealing with the sale to Trans World and therefore the Statute of Frauds barred plaintiff's claim for a commission. The trial judge acknowledged that defendant "concededly intended to pay a commission, but he never agreed to any terms or to any amount with reference to this sale and never signed anything which could cause this court to find that there has been compliance" with the statute. The trial judge noted that "this may be a harsh result" but it was not enough that plaintiff expected a commission and defendants intended to pay one.
Plaintiff contends it is entitled to a real estate broker's commission at the rate of 10% of $1,100,000 or $110,000 on the sale by defendants of their property to Trans World because: (1) defendant's letter of April 10, 1980 authorizing a sale of property for $1,200,000 was not conditioned on that sales price and was sufficient authority for a sale on any other terms satisfactory to defendant under the Statute of Frauds, N.J.S.A. 25:1-9; (2) defendant's notes to himself and his attorney were sufficient written memoranda to comply with the Statute of Frauds, and (3) plaintiff's confirmatory letter of December 4, 1981 is sufficient to comply with the second paragraph of the Statute of Frauds.
*165 Defendants contend that in the letter of April 10, 1980 they agreed to pay a commission only upon a sale of the property at a price of $1,200,000; they maintain that the Statute of Frauds is not even involved in this proceeding because plaintiff did not prove any underlying oral agreement to pay a broker's commission; for this reason, neither defendant's letter of April 10, 1980 nor his notations or plaintiff's confirmation letter of December 4, 1981 are relevant to the Statute of Frauds.
Initially, we are confronted with two procedural problems: the parties do not agree as to the proper standard of review and, although they both seem to agree that the Statute of Frauds is not involved, they disagree as to the reason. Plaintiff contends that there is no question concerning compliance with the Statute of Frauds and defendants contend that there is not even an underlying agreement so as to consider the Statute of Frauds. We will first discuss the procedural matter concerning the standard of review.
The problem arises because of the impermissible procedure followed by the trial judge. In reserving defendants' motion at the conclusion of the plaintiff's case, the trial judge recognized that the motion should be denied or granted at that time and not reserved. In his opinion at the conclusion of the case, the trial judge reviewed all of the evidence but concluded that he should have granted defendants' motion at the close of plaintiff's case. He therefore entered a judgment of dismissal even though he heard the entire case. R. 4:37-2(b) states:
Whether the entire action is tried with or without a jury, such motion shall be denied if the evidence, together with legitimate inferences therefrom, could sustain a judgment in plaintiff's favor.
Under this rule the trial judge cannot reserve decision on a motion for judgment at the close of plaintiff's case. Castro v. Helmsley Spear, Inc., 150 N.J. Super. 160, 163 (App.Div. 1977). The rule tacitly disapproves "a practice enabling a judge to view as nonexistent probative evidence from a defendant which may cure the deficiencies in a plaintiff's case, or which, at the least, creates a jury question concerning plaintiff's right *166 to recover." Id. at 164. If a motion is not granted at the close of plaintiff's case it must be deemed to have been denied. Ibid.
We agree with defendants under their Point I that the entire record of the trial should be considered. Under this, the trial judge's findings and conclusions at the close of the entire case, even though phrased in terms of granting defendant's prior motion to dismiss, are viewed as the findings and conclusions mandated by R. 1:7-4.
On a motion for involuntary dismissal at the close of the plaintiff's case, the test as set forth in R. 4:37-2(b) is whether the evidence, together with all legitimate inferences therefrom, could sustain a judgment in plaintiff's favor, if, accepting as true all the evidence which supports the position of the party defending against the motion and according him all the benefits of all inferences which can reasonably and legitimately be deducted therefrom, reasonable minds could differ, the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5 (1969). On a motion for a judgment for involuntary dismissal, the trial court is not concerned with the worth, nature, or extent (beyond a scintilla) of evidence, but only with its existence, viewed most favorably to the party opposing the motion. Id. at 5-6. In view of this standard, we find that the motion should have been denied.
Turning now to the substantive issue, we disagree with defendants that there is no underlying agreement to pay a commission and therefore we will consider the Statute of Frauds concerning the payment of a real estate broker's commission. N.J.S.A. 25:1-9 provides:
Except as herein otherwise provided, no broker or real estate agent selling or exchanging real estate for or on account of the owner shall be entitled to any commission for such sale or exchange, unless his authority therefor is in writing, signed by the owner or his authorized agent, or unless such authority is recognized in a writing or memorandum, signed by the owner or his authorized agent, either before or after such sale or exchange has been effected, and, in either case, the rate of commission on the dollar or the amount of the commission shall have been stated therein.
*167 In order to recover a broker's commission for sale of real estate, three elements are required: (1) the authority must be in writing; (2) signed by the owner, and (3) the rate of commission on the dollar must be stated. As applied to the facts of this case, there is no question but that defendants' letter of April 10, 1980 to McCafferty complies. It (1) authorizes plaintiff to sell defendants' property; (2) is signed by defendants, and (3) states the rate of commission at 10%. The threshold question is whether that offer was expressly conditioned upon a sale of $1,200,000 or whether plaintiff may recover its commission based upon the sale which was eventually made on terms satisfactory to defendants.
When a seller lists property for sale with a real estate broker at a given sales price, it is rare indeed that the property is sold at the list price. To the seller, the list price is the sales price which he would like to receive for the sale of the property; to a buyer a list price is an invitation to submit a counter-offer. More often than not, a counter-offer is a figure under that which the buyer actually expects to pay. Through traditional bargaining in the market place, the sales price and the terms of the sale are then negotiated and the sale consummated between a willing buyer and a willing seller. The real estate broker plays a key role in this process and, as the trial judge observed in the present case, both the seller and the broker expected that a commission would be paid for this service. As stated in Harris v. Perl, 41 N.J. 455, 462 (1964): "The economic facts and the expectations of fair men with respect to real estate brokerage are clear enough. The role of the broker is to bring buyer and seller together at terms agreeable to both, and both know the broker expects to earn a commission from the seller if he succeeds."
Ordinarily, the commission is earned when the broker has, pursuant to his employment, procured a purchaser ready, able and willing to buy the lands on the terms and conditions authorized by the contract of employment or accepted by the *168 principal. Alnor Construction Co. v. Herchet, 10 N.J. 246, 253 (1952). There are many cases which express the same proposition that a real estate broker is entitled to a commission not only on terms specified in the listing agreement, but upon "[o]ther terms duly agreed upon between the buyer and the seller," e.g., Van Wagner v. Enz, 75 N.J. Super. 251, 256 (App.Div.), certif. den. 38 N.J. 497 (1962); "[o]r other and different terms which are satisfactory to his principal," Abeles v. Adams Engineering Co., 64 N.J. Super. 167, 178 (App.Div. 1960) mod. 35 N.J. 411 (1961), see cases cited by Judge Kilkenny at 178; "[s]uch other price and terms satisfactory to the owner," George H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159, 170 (App.Div. 1957); "[o]r with other or different terms which, however are satisfactory to the owner," Todiss v. Garruto, 34 N.J. Super. 333, 338 (App.Div.), certif. den. 18 N.J. 549 (1955); "[o]r on different terms which, however, are satisfactory to the owner," Marschalk v. Weber, 11 N.J. Super. 16, 21 (App.Div. 1950), and see cases cited by Judge Jayne at 21.
In Marschalk, Judge Jayne, speaking for this court reversed a judgment of involuntary dismissal for a broker's commission for procuring a purchaser on a counter-offer:
And so we are unable to confer our approval of the abstract conclusion that a written authorization to sell a tract of eight acres, which memorandum is in all essential respect in conformity with the requirements of the statute, becomes legally ineffectual and unenforceable where the broker in pursuit of that authority procures a counter-offer from a competent purchaser to acquire not only the eight-acre tract in accordance with the terms stated in the authorization, but also another tract of one-half acre at a separate price and the owner accepts the counter-offer. [11 N.J. Super. at 23].
Many of the cases cited above, while acknowledging the general rule, denied recovery because of the failure of a condition precedent, e.g., the commissions were to be payable only "upon passage of title."
More specifically, the rule in New Jersey and elsewhere, is that even though the listing agreement may set forth one price, "ordinarily a broker is entitled to commission where he *169 furnishes the buyer to the seller even though the ultimate sale is for a lesser price, provided there has been no significant break in the negotiations and the final price is duly agreed upon by the seller and the buyer." Loeb v. Peter F. Pasbjerg & Co., 22 N.J. 95, 100 (1956), accord, Fry v. Doyle, 167 N.J. Super. 486, 493 (App.Div.), certif. den. 81 N.J. 287 (1979); Mack v. Revicki, 47 N.J. Super., 185, 192 (App.Div. 1957)[2]; Annotation, "Broker's right to commission where owner sells property to broker's customer at less than stipulated price," 46 A.L.R.2d 848 (1956), § 3 at 852-856. As stated therein:
The general proposition is well-established that if property is placed in the hands of a broker for sale at a certain price, and a sale is brought about through the broker as a procuring cause, he is entitled to commissions on the sale even though the final negotiations are conducted through the owner, who, in order to make a sale, accepts a price less than that stipulated to the broker. The law will not allow the owner of property sold to reap the fruits of the broker's labor and then deny him his just reward. [Id. at 852].
In Abeles v. Adams Engineering Co., Inc., supra, defendant agreed to pay a commission to plaintiff loan broker as follows:
If you are successful in concluding a 15-year institutional loan in the amount of $1,600,000.00 upon terms to be mutually agreeable to both parties, this company agrees to pay you a brokerage of six percent (6%) of the amount of the loan. (64 N.J. Super. at 173].
The broker obtained a loan commitment in a lesser amount, but only if defendant's principal agreed to take out a significant amount of life insurance to secure its payment. The trial judge found that defendant's principal had orally agreed to that condition, but later changed his mind. The trial court held that plaintiff was entitled to its commission. On appeal defendant argued the commission never became due because the loan was never consummated, relying on the language that he would pay the broker if he was "successful in concluding a 15-year institutional loan..." Id. at 177. As framed by the Appellate *170 Division, the issue was "Does this language express a clear and unequivocal condition which supports the defendant's contention?" At 177. This court held not, reasoning:
The word "you" used in the agreement is addressed to the broker. So far as the broker is concerned the only way he could be successful in concluding his portion of the loan transaction would be by arranging a meeting of the minds between the defendant and a ready, willing and able lender. Beyond this the consummation of the transaction was dependent upon the actions of the parties. Contrast the above language with that used in cases where the courts have held that the language used constituted a condition precedent to liability. Illustrative expressions are "we shall be liable only in the event of passing of title," Murray Apfelbaum, Inc. v. Topf, 104 N.J.L. 343 (E. & A. 1928); "said commission to become due * * * upon closing of title," Lippincott v. Content, 123 N.J.L. 277 (E. & A. 1939); "which commission * * * shall be payable if, as and when title actually closes and not otherwise," Alexander Summer Co. v. Weil, 16 N.J. Super. 94 (App.Div. 1951) "this commission is contingent upon the transaction being consummated and in the event that said transaction is not consummated then and in that event no commission shall be payable to said broker," Todiss v. Garruto, 34 N.J. Super. 333 (App.Div. 1955). In our opinion the language used in the brokerage agreement does not clearly and unequivocally create a condition precedent so as to take the broker's right to his commission out of the general rule. See Alnor Construction Co. v. Herchet, 10 N.J. 246, 253 (1952). [64 N.J. Super. at 177-178].
And so it is here. The brokerage agreement does not contain a condition precedent so as to take plaintiff's right to a commission out of the general rule that a commission is earned and payable when he secures a buyer on terms satisfactory to the owner, albeit lower than the listed sales price.
The New Jersey cases cited by the parties in support of their respective positions are merely specific applications of the general principle and its exception. None are directly on point. In Ganley v. Kalikman, 105 N.J.L. 311 (Sup.Ct. 1929), aff'd 106 N.J.L. 237 (E. & A. 1930), and Walsh v. Isgro, 121 N.J.L. 165 (E. & A. 1938), cases cited by plaintiff, the respective courts found that a statement on the listing agreement commanding a particular price did not condition the commission upon receipt of that price when the owner accepted the buyer's lower offer. Neither case involved language resembling the alleged condition *171 here, i.e., defendants' promise to pay a 10% commission on a sale "at that price." The New Jersey cases cited by defendants are equally inapposite. In both Feist & Feist v. Bloomfield Bank & Trust Co., 120 N.J.L. 221 (E. & A. 1938) and Breen v. Debron, 10 N.J. Super. 167 (App.Div. 1950), certif. den. 6 N.J. 399 (1951), the authorization limited a commission to a sale to a particular prospect.
We do not take issue with the out-of-state cases cited by defendants to support their argument that the owner may condition a commission upon procuring a sale at a particular price which will be enforced, notwithstanding that the broker's prospect purchased at a lower price. However, in our view, under the facts and circumstances of this case the commission to plaintiff was not conditioned on a sales price of $1,200,000.
An agreement, whether integrated or unintegrated must be considered in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose. Tessmar v. Grosner, 23 N.J. 193, 201 (1957). Formal and interpretative rules are readily subordinated toward the goal of ascertaining and effectuating contemplation or common intention of the parties. Ace Stone, Inc. v. Wayne Township, 47 N.J. 431, 439 (1966). In construing the contract the court does not focus on an isolated phrase but reads the contract as a whole, and considers the surrounding circumstances. Newark Publishers' Ass'n v. Newark Typographical Union, 22 N.J. 419, 426-427 (1956). In addition, the conduct of the parties after execution of the contract is entitled to great weight in determining its meaning. Journeymen Barbers, etc., Local 687 v. Pollino, 22 N.J. 389, 395 (1956).
It is clear from the fourth paragraph of defendant's letter of April 10, 1980 that the $1,200,000 sales price was not *172 carved in stone; he told McCafferty that it would be "foolhardy of us not to seriously consider any legitimate proposal." Defendant knew that plaintiff expected a 10% broker's commission for the sale of the property. Defendant never indicated that 10% was an unacceptable rate and his notations to himself in September and October 1981 indicate that he had no quarrel with the 10% rate stated in his letter to McCafferty. If the rate itself was an issue when the property was sold to Trans World for less than $1,200,000, defendant would certainly have raised the issue at that time. In his letter of April 10, 1980 to McCafferty, defendant never said that a commission would be paid only at a sales price of $1,200,000.
Even though defendant knew that plaintiff was expecting a commission on the sale at $1,100,000, he never at any time, either before or after the agreement was signed, indicated that he would not pay a commission on the sales price of $1,100,000. He merely stated that he desired to have a separate agreement for brokerage commission. The sole problem with the payment of commission was the nature of the installment and whether interest was to be paid. Defendant adamantly refused to pay interest on the installments even though he purportedly did not know the amount of the installments. After the agreement was signed and Trans World delayed in processing its application for municipal approvals, he requested McCafferty and Ward to assist in expediting the approvals, which they did. He surely did not expect that they were performing the services gratuitously. He requested plaintiff to attempt to get $50,000 more at settlement from Trans World to apply toward the payment of the commission at settlement. When Ward and McCafferty persuaded the buyer to come up with the additional $50,000 he was very pleased. Defendant indicated that he could perhaps pay $40,000 of the commission at the closing and pay "whatever balance remained in a shorter period of 18 months."
*173 In Harris v. Perl, supra, 41 N.J. at 463, our Supreme Court observed that
[i]n a practical world the broker must trust that those who seek or willingly accept his services will not cheat him of the fruit of his industry. The courts should protect from that abuse, except insofar as the countervailing policy of the statute of frauds may insulate the owner from liability.
It is ironical that the defendant himself is also a real estate broker.
We find that under the foregoing facts, defendants authorized plaintiff to sell their property; that the letter of April 10, 1980, from defendant to plaintiff, fully complies with the requirements of the Statute of Frauds; that the authorization to sell for $1,200,000 was not an express condition of the authorization to sell; that defendants entered into a binding contract to sell to Trans World for $1,100,000; that plaintiff and the co-broker Ward were the sole motivating factors for bringing about that sale; that the defendant's notes to himself and his attorneys are written memoranda to corroborate an intent to pay a commission on a sales price less than $1,200,000 and that the plaintiffs are entitled to their commission of 10% of the sales price of $1,100,000 or $110,000. Prejudgment interest at the legal rate according to the rules of the court is allowed as follows:
On $40,000 from December 7, 1981 (settlement date) to June 6, 1983.
On $20,000 from June 7, 1982 to June 6, 1983.
On $20,000 from December 7, 1982 to June 6, 1983.
Interest on the entire $110,000, which includes the last installment of $30,000 shall accrue from June 7, 1983.
In view of our holding, we make no determination on plaintiff's contention concerning recovery on quantum meruit or plaintiff's letter of December 4, 1980 as complying with the second paragraph of N.J.S.A. 25:1-9.
The judgment is reversed and remanded for entry of judgment in favor of the plaintiff in accordance with this opinion.
NOTES
[1] McCafferty acknowledged that he made a $10,000 mistake in the amount of the installment payments which amounted to only $60,000 for a total commission of only $100,000.
[2] Mack v. Revicki is cited, analyzed and extensively quoted with approval in 11 Williston on Contracts (3 ed. 1968), § 1326 at 154-57, n. 8-17. As noted in n. 14 of the text: "Williston on Contracts [is] one of the few treatises which are authoritative in themselves instead of being merely reference books and sources from which authorities may be derived ..."