ALBERT M. GREENFIELD AND CO. OF NEW JERSEY, INC., NOW KNOWN AS HELMSLEY-GREENFIELD, INC., PLAINTIFF-APPELLANT, v. SSG ENTERPRISES, A NEW JERSEY PARTNERSHIP, THE SULLIVAN GROUP, A NEW JERSEY PARTNERSHIP, ELLIOTT GOLDBERG, THE SHAPIRO GROUP, A NEW JERSEY PARTNERSHIP, BARRY SHAPIRO, KENNETH SHAPIRO, DONALD TRUMP, SEASHORE FOUR ASSOCIATES, HARRAH'S ASSOCIATES, TRUMP PLAZA CORPORATION, ATLANTIC CITY SEASHORE 2, INC., DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 10, 1986—Decided October 2, 1986.

1

Before Judges FURMAN, DREIER and STERN.

*M. Jefferson Davis* argued the cause for appellant (*Montgomery, McCracken, Walker & Rhoads,* attorneys; *M. Jefferson Davis,* on the brief).

*Gregory D. Saputelli* argued the cause for respondents SSG Enterprises, The Sullivan Group and Daniel J. Sullivan (*Obermayer, Rebmann, Maxwell & Hippel,* attorneys; *Gregory D. Saputelli,* on the brief).

*Joseph F. Fabian* argued the cause for respondents The Goldberg Group and Elliott Goldberg (*Feingold & Jehl,* attorneys).

*Brian Spector* argued the cause for respondents Harrah's Associates and Seashore Four Associates (*Ribis, McCluskey, Graham & DeCotiis,* attorneys, *Nicholas L. Ribis,* of counsel; *Brian Spector* and *Deborah E. Nelson,* on the brief).

*Howard E. Drucks* argued the cause for respondents Donald Trump, Trump Plaza Corporation, Atlantic City Seashore 2, Inc. (*McGahn, Friss & Miller,* attorneys; *Howard E. Drucks,* on the brief).

The opinion of the court was delivered by

DREIER, J.A.D.

Plaintiff has appealed from a judgment for defendants in this action for real estate commissions arising from the lease and sale of a portion of the property on which the Trump Plaza Hotel and Casino is now located. The trial judge determined that plaintiff was entitled to rental commissions only from April through October 1983, but that its claims for rental commissions thereafter and commissions upon the sale of the real estate were unwarranted. He further found that plaintiff's commission agreement was limited to a sale pursuant to the strict terms of an option to purchase granted in the original lease, but that the actual sale was by a renegotiated separate sales agreement, executed after a valid termination of the original lease in which the option to purchase had been included. We are constrained to reverse.

We need not recount here the initial services rendered by plaintiff which is acknowledged as having brought the parties together, or the negotiations among the various defendants culminating in the long-term lease dated July 1, 1980 (signed July 18, 1980) and a revised commission agreement also signed July 18, 1980 between the SSG and plaintiff. It is sufficient for the purposes of this opinion to note that defendant SSG Enterprises, a New Jersey general partnership, was the original lessor, later the grantor, and throughout the transaction was the primary entity obliged to pay the commission to plaintiff. The lessee was originally Atlantic City Seashore 2, Inc. and, after intermediate assignments to other Trump enterprises, became Harrah's Associates, a partnership equally owned by Donald J. Trump and Harrah's Atlantic City, Inc. The property in question was finally sold on November 2, 1983 to Seashore Four Associates, also a partnership equally owned by Donald J. Trump and Harrah's Atlantic City Inc. Considering the various interlocking corporations and partnerships, we will refer merely to the SSG defendants and the Trump defendants unless otherwise required by context.[1]

Plaintiff and SSG's predecessor entered into a brokerage agreement calling for a six percent rental commission, and a six percent sales commission if the tenant exercised the option to purchase to be contained in a contemplated lease. The eventual SSG-Trump lease, signed July 18, 1980, contained various cancellation provisions discussed *infra*, and recognized SSG's obligation to pay plaintiff's commission or commissions. The lease

---

[1]The S.S.G. defendants include (1) S.S.G. Enterprises, a New Jersey general partnership; (2) the three partners of S.S.G. Enterprises, Inc., namely The Sullivan Group, The Shapiro Group and The Goldberg Group, also New Jersey general partnerships, and (3) the individual partners of these groups. The Trump defendants included (1) Donald J. Trump in his capacity as controlling shareholder of Trump Plaza Corporation and Atlantic City Seashore 2, Inc. and in his capacity as a partner in Harrah's Associates and Seashore Four Associates; (2) Harrah's Associates and Seashore Four Associates, both New Jersey general partnerships, having as their partners Donald Trump and Harrah's Atlantic City, Inc., and (3) Trump Plaza Corporation.

was for a term of 98 years and six months, with an option to purchase in Article 44, exercisable any time during the term of the lease at the price of $8,000,000 up to June 30, 1990, $8,500,000 until June 30, 1995 and $10,000,000 thereafter. There was an additional option to purchase for $5,000,000 contained in Article 52.3; but this option would arise only in the event of a disqualification of a "controlling person" by the Casino Control Commission.

The revised commission agreement between plaintiff and SSG decreased the amount of commission from the original six percent to five percent and restricted payment of the commissions to situations where there was a "fully effective" lease with Trump. The agreement also recited that a five percent commission would be payable if the lessee properly exercised its purchase option. The trial judge determined that Paul Longo, the employee of plaintiff in charge of this transaction, signed the agreement "voluntarily and understandingly," and that his attorney had received copies of the proposed lease and commission agreement before the July 18th meeting.

Plaintiff received its commissions for the first two years' rental, prepaid at the time of the execution of the lease. Thereafter additional rental commissions were paid for the period July 1, 1982 through March 31, 1983. After that date no further commissions were paid, although rent was paid through October 1983, and the court correctly awarded plaintiff commissions for that period.

After the lease was executed, Trump commenced construction and pursued his casino license application. By October 1, 1983, the tower erected on the square block including the subject premises was 95 percent completed and had a value of between $230,000,000 and $240,000,000. Approximately $72,-000,000 of the construction rested on the SSG parcel. Contemporaneously, however, the Casino Control Commission had through its counsel voiced numerous objections concerning the lease. It ruled that the lessors must qualify as financial

sources of the project pursuant to *N.J.S.A.* 5:12–84(b), and questions were raised concerning the background of Daniel J. Sullivan, a principal of SSG. Trump objected to lease modifications required by the Commission, and both he and his attorneys feared that such onerous changes could give the lessor grounds to terminate the lease for cause. The trial judge in his comprehensive opinion traced the negotiations between the parties and with the Commission which culminated when Sullivan, on behalf of SSG, ostensibly terminated the lease on October 5, 1983. SSG then filed a summary dispossess action in the Law Division. Trump responded with a Chancery action to compel SSG to accede to the Commission modifications.

At a subsequent meeting in New York in mid-October 1983, Donald Trump and Daniel Sullivan resolved their differences by permitting Trump to purchase the premises for $8,000,000 on approximately the same terms as were set forth in the lease.[2] The trial judge made explicit findings that this settlement was not in any way entered into with the intention to preclude plaintiff from receiving a commission. The court found "that the parties struck the deal to sell the property in response to what they perceived as a bona fide dispute over the continued effectiveness of their lease. It was an arms length, legitimate business arrangement."

I

As to the basic facts adjudicated by the judge, we have no hesitancy in upholding his findings. There was sufficient credible evidence present in the record, considering the proof as a whole, to sustain his conclusions. *Rova Farms Resort v.*

---

[2]The lease provided for an $8,000,000 price, either payment in full at closing or, at the election of S.S.G., in installments over a 3–year to a 5–year period with interest at the lesser of 10% or 1% over the prime rate, secured by a purchase money mortgage. The actual sale terms were $5,000,000 paid at closing, with the $3,000,000 balance payable over 15 years at 10%, secured by a letter of credit.

*Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974). The trial judge relied upon *Brenner & Co. v. Perl*, 72 *N.J.Super.* 160, 165 (App.Div.1962), for the proposition that plaintiff's entitlement was circumscribed by the terms of his commission agreement. *But compare Fry v. Doyle*, 167 *N.J.Super.* 486, 493–94 (App. Div.1979), certif. den. 81 *N.J.* 287 (1979), where the agreement did not so sharply limit the entitlement to the commission. There the general proposition could be applied that a broker who procures "a purchaser, ready, willing and able to comply on terms other than or different from those originally specified, but which are satisfactory to the owner" does not lose his commission. *Id.* at 495. The commission is earned if the broker is the efficient producing cause in bringing about the sale, so long as the transaction is consummated without a substantial break in negotiations. *Id.* at 494, and the cases there cited. *See also Joseph Hilton & Associates, Inc. v. Evans*, 201 *N.J.Super.* 156, 167–170 (App.Div.1985).

SSG undertook to pay plaintiff's commission under the terms of the revised commission agreement of July 18, 1980:

> We hereby agree that if negotiations are successfully concluded and result in the execution and delivery by the lessor and the lessee of a lease free of escrow and as to which all conditions have been satisfied so that the lease is by its terms fully effective, then the partnership will pay to Albert M. Greenfield & Company and brokerage commission as follows:
>
>     *      *      *      *      *      *      *      *
>
> Five (5%) percent of the purchase price for the property as provided in the Option, if the lessee properly exercises the Option, payable to you if as and when payment of such purchase price is in fact received by the partnership.

Since the agreement circumscribed plaintiff's right to a commission, if, the lease in fact had been terminated and not restored, and particularly if the parties had entered into a substantially dissimilar purchase arrangement, we might have had no cause to disturb the trial judge's ruling.[3]

---

[3]The near congruency of the terms of the lease and final purchase agreement provides a basis for us to disagree with the trial judge's construction of the sale agreement. The increased payment term for the $3,000,000 was noted as

We need not, however, examine the status of the lease at each step in the negotiation process, nor need we compare the terms of the final transfer of title with the original lease, since the trial judge apparently overlooked several of the documents signed by both SSG and Trump at the closing. These documents indicate clearly that the parties themselves considered the lease still in effect, not terminated as urged by SSG.[4] Inexplicably, none of these documents were alluded to by the trial judge in his findings, other than the commission indemnification form which he characterized as "lawyer's 'busy work'." Referring to the closing documents, we note first that the deed from SSG to Trump was expressly subject to the "Ground Lease dated July 1, 1980, as amended and assigned," a short form of which had been recorded. The deed continued:

The leasehold estate created by the Ground Lease and the fee estate being demised hereby are not intended to merge into a single estate but have been and shall remain good and valid and separate and apart and *the Ground Lease has been and remains in full force and effect.* [Emphasis supplied].

This deed is signed by SSG Enterprises by representatives of The Sullivan Group, The Goldberg Group and The Shapiro Group, including Daniel J. Sullivan, all of whom contended at trial that the lease had been terminated. The deed was acknowledged and recorded. In addition to the deed, SSG Enterprises executed and delivered at the closing an assignment of the Ground Lease; and the affidavit of title, also executed under oath, noted an exception for the Ground Lease from the general negation of any other outstanding interests created by SSG affecting its ownership or use of the property. Lastly, the

---

benefiting the parties from a tax standpoint, and securing the payments by a letter of credit was of direct benefit to S.S.G. which could thus avoid a foreclosure proceeding in the event of a default.

[4]We note parenthetically that the terms of the commission agreement only called for "the execution and delivery by the lessor and lessee of *a* lease ... as *to which all conditions have been satisfied."* There is no question that, notwithstanding the purported termination of the signed lease, the Trump group remained in possession of the premises through and including the closing of title with adjustments made to that date.

title insurance policy procured and delivered at closing provides that the lease was also insured as part of the policy and "did not and shall not merge into the fee title insured hereunder." All of these documents were prepared and reviewed by defendants' counsel before and at the closing.[5] The parties respectively delivered and accepted the deed and accompanying documents reciting the effectiveness of the lease found terminated by the trial judge.

It makes no difference to plaintiff's position if the lease was reinstated at the closing, or if it had never been effectively terminated. It is further immaterial that the parties did not designate their transaction as an exercise of the option under the lease, or even, as here, if they signed a declaration to the contrary. *See* note 5, *supra.* The fact remains that the parties treated the lease as fully effective at the closing, and Trump took title upon terms substantially in accordance with the option. We are, therefore, constrained to reverse. Plaintiff was contractually entitled to receive its commission from SSG.

## II

We must next discuss whether the Trump group may likewise be responsible for the payment of the commission based upon any tortious interference with plaintiff's contractual rights, conspiracy or fraudulent concealment of any facts from plaintiff. Viewing the actions of Trump up to the settlements of the summary dispossess and specific performance actions, we find no basis for plaintiff's assertion of wrongdoing. Don-

---

[5] It is true that the Trump group provided S.S.G. with a letter that their acquisition was "not an exercise of Lessor's option to purchase pursuant to the Article Forty-Fourth" of the Ground Lease, and further the parties signed a letter agreement warranting that no broker had brought about the transaction, each agreeing to indemnify the other if its acts resulted in a claim for a broker's commission. Although these letters evidence an attempt to deprive plaintiff of its claim for commissions, they cannot foreclose a court from determining the legal effect of the repeated and studied declarations to the contrary in the deed and accompanying closing documents.

ald Trump did all that he could, including instituting suit, to maintain the integrity of lease. We agree with the trial judge that, even at the meeting with Sullivan, Trump had no desire to interfere with plaintiff's economic relationship and that his sole motive was to preserve the integrity of his project.

These facts, however, may or may not permit an inference of sufficient legal malice to sustain a finding of tortious interference at least at the signing of the closing documents. The final agreement went further than the mere transfer of title on terms substantially the same as those in the lease. The "gentlemen's agreement" with Sullivan to sell at the same $8,000,-000 price as was contained in the original lease resulted in Trump's executing and delivering a written confirmation that the acquisition of the property was "not an exercise of the Lessor's option to purchase pursuant to the lease." That agreement, however, also precipitated the exchange of the letters and indemnification agreements, noted above, stating that no broker had brought about the transaction. Trump signed these letters knowing full well that plaintiff had brought the parties together and that his commission agreement had been memorialized in the original lease.

Most of our reported cases deal with a buyer's or seller's obligation for a commission when the sale was not consummated. In such cases in determining the buyer's liability to the broker, the court must examine both the sales agreement between buyer and seller and the commission agreement between broker and seller. *Rothman Realty Corp. v. Bereck,* 73 *N.J.* 590, 600–01 (1977). The Court there noted:

> It is only when the buyer fails or refuses to comply with both agreements, the express contract to purchase the land and the agreement with the broker to complete the transaction, *without a valid reason for either,* that he becomes liable to the broker for a breach of the implied promise. [Emphasis in original].

Since title passed, the first element of the *Rothman* equation has no application here. The issue, however, is whether Trump could have been found to have breached any agreement with plaintiff, an acknowledged third-party beneficiary of the origi-

nal lease. The buyer's promise to refrain from any wrongful act or misconduct, even without "any written or formal agreement with the broker ... has been implied by law." *Rothman Realty Corp. v. Bereck, supra,* 73 *N.J.* at 602. This is merely a specialized restatement of the general principle that in all agreements there is an implied covenant of good faith and fair dealing between the parties to the agreement. *Onderdonk v. Presbyterian Homes of N.J.,* 85 *N.J.* 171, 182 (1961).

As was noted in *Joseph Hilton & Associates Inc. v. Evans, supra,* 201 *N.J.Super.* at 167–68:

> Ordinarily, the commission is earned when the broker has, pursuant to his employment, procured a purchaser ready, able and willing to buy the lands on the terms and conditions authorized by the contract of employment *or accepted by the principal. Alnor Construction Co. v. Herchet,* 10 *N.J.* 246, 253 (1952). There are many cases which express the same proposition that a real estate broker is entitled to a commission not only on terms specified in the listing agreement, but upon '[o]ther terms duly agreed upon between the buyer and the seller,' *e.g., Van Wagner v. Enz,* 75 *N.J.Super.* 251, 256 (App.Div.), certif. den. 38 *N.J.* 497 (1962); '[o]r other and different terms which are satisfactory to his principal,' *Abeles v. Adams Engineering Co.,* 64 *N.J.Super.* 167, 178 (App.Div.1960) mod. 35 *N.J.* 411 (1961), see cases cited by Judge Kilkenny at 178; '[s]uch other price and terms satisfactory to the owner,' *George H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc.,* 44 *N.J.Super.* 159, 170 (App.Div.1957); '[o]r with other or different terms which, however are satisfactory to the owner,' *Todiss v. Garruto,* 34 *N.J.Super.* 333, 338 (App.Div.) certif. den. 18 *N.J.* 549 (1955); '[o]r on different terms which, however, are satisfactory to the owner,' *Marschalk v. Weber,* 11 *N.J.Super.* 16, 21 (App.Div.1950), and see cases cited by Judge Jayne at 21. [Emphasis in original].

*See also Loeb v. Peter F. Pasbjerg Co.,* 22 *N.J.* 95, 100–01 (1956), where one of two co-brokers waived his commission in order to facilitate the sale, and the question there was whether, in doing so, and without authority, he also waived his co-broker's commission. The Supreme Court stated that the broker was

> at liberty to waive his own interest in the commission claim but he had neither any moral nor legal right to waive the plaintiffs' interest therein; on the contrary he was under an implicit obligation to protect the plaintiffs' interest faithfully and not to abandon it without their prior approval. *Id.* at 101.

■ Here Trump negotiated the price of $8,000,000 without commission. Many cases have discussed a buyer's good faith

refusal to consummate a purchase, and have included financial circumstances beyond the buyer's control as a rightful ground. *See Rothman Realty Corp. v. Bereck, supra,* 73 *N.J.* at 603–04. But such a motivation cannot be merely the buyer's desire to purchase the property for a lower price by attempting to relieve the seller of its obligation to pay a broker's commission. Trump had no right to rely upon the fact that the sale's terms were slightly different than those originally established in the lease to argue that either the lease or the commission agreement or both had been abrogated. The modification of terms of payment between buyer and seller does not vitiate a commission agreement. *Joseph Hilton & Associates Inc. v. Evans, supra,* 201 *N.J.Super.* at 167–170.

▮ The trial judge in his opinion found that SSG and Trump had not "acted in concert to induce SSG to break the commission agreement with plaintiff." The trial judge reached this conclusion on the basis of a finding that the commission agreement was ineffective. The court made specific findings that Trump had not induced Sullivan to breach the commission agreement, stating that having observed Sullivan closely on the witness stand "the Trump/Harrah's defendants could [not] have persuaded him to get a drink of water if he did not want one, let alone breach the terms of a contract." This conclusion misses the point. Plaintiff does not claim that Trump induced Sullivan to breach the contract, but rather that Trump aided Sullivan in an attempt to breach the commission agreement by signing the "non-exercise" and "no broker" letters, thus saving SSG or Trump $400,000 or more.[6] We, therefore, conclude that

---

[6]Arguably the sales price would have to have been $8,421,052.63, with a five percent commission of $421,052.63 for S.S.G. to have received its full $8,000,-000 after commission. On the other hand, if Trump were to pay only $8,000,000, S.S.G. would have received $7,600,000 after commission.

We cannot at this juncture determine what would have happened had there been a demand for a higher sales price to cover the commission, since plaintiff has not sought more than the commission payable on the $8,000,000 sale price. We feel secure in limiting the base upon which the commission

the trial court must review Trump's participation in this transaction anew, against the background of our conclusion that SSG is responsible for plaintiff's commissions as a matter of law. This court should exercise its fact-finding jurisdiction sparingly. *Rova Farms Resort v. Investor Ins. Co.*, 65 *N.J.* 474, 483–84 (1974).

A harder question is the measure of damages against Trump for an attempted breach of the commission agreement, if the trial judge determines the liability issue adversely to Trump. Had the question been presented at or before closing, a court could merely have ordered that the commission be paid as a disbursement. Even at this time, plaintiff may be made whole from the payments still owing on the $3,000,000 balance secured by the letter of credit. At oral argument before us, however, counsel for plaintiff expressed some reservation concerning the collectability of a judgment against SSG, and we have no way of knowing whether such future payments have been assigned, attached or otherwise shielded from plaintiff's collection efforts. Trump's participation may have caused plaintiff to lose nothing or may have occasioned a mere Pyrrhic victory against SSG if its assets are indeed dispatched.

The trial judge initially found no legal malice, citing *Lewis Schlesinger Co. v. Rice*, 4 *N.J.* 169, 181 (1950). Trump's attempt to preserve his economic position by settling with SSG may not be considered malicious in common parlance. But as legally defined, the malice required for the tort of malicious interference with contractual advantage is merely "the intentional doing of a wrongful act without justification or excuse." *Lewis Schlesinger Co., supra,* 4 *N.J.* at 181. A justification or excuse, however, cannot be "the indirect purpose of benefiting the actor at the expense of another, unless done in the exercise

---

will be calculated to $8,000,000, since, as we noted in part I of this opinion, the lease was acknowledged by the parties to have remained in full force and effect and the $8,000,000 figure is clearly set forth therein as the option price.

of an equal or superior right." *Id.* at 181. Trump could not aid SSG to breach its agreement merely to obtain a better price. As noted in *Lewis Schlesinger Co. v. Rice:*

> The 'morals of the market place' do not sanction this deliberate invasion of plaintiff's contractual rights; neither does the law. (4 *N.J.* at 182).

By executing and delivering the letters Trump could be found to have aided SSG to deprive plaintiff of its commission, and thus became a joint-tortfeasor. Were it not for its alleged active participation in SSG's breach of its commission agreement, Trump could not be liable to plaintiff for the commission, since only SSG was contractually responsible to plaintiff, and Trump would be entitled to complete indemnification both by agreement and the law. *See Adler's Quality Bakery Inc. v. Gaseteria*, 32 *N.J.* 55, 79–80 (1960).

■ In the usual case, the common-law right of indemnification is lost when a party is deemed a joint-tortfeasor. *Cartel Capital Corp. v. Fireco of N.J.*, 81 *N.J.* 548, 566 (1980). We note, but do not determine, that it appears inequitable, due to the primary responsibility of SSG and the indemnification letter, to enforce this general prohibition. Even as recognized in *Cartel Capital Corp.:*

> It would be inequitable to permit an active wrongdoer *in the absence of a contractual understanding between the parties* to obtain indemnity from another wrongdoer and thus escape any responsibility. [at 566; emphasis supplied].

We, therefore, point out that even if the trial judge determines Trump to be a joint-tortfeasor, Trump may be entitled not only to contribution but also to indemnification from SSG for any sums payable to plaintiff. In the event of an execution against Trump, and providing there are no third parties' vested rights involved, the commission could be deducted from any escrow funds by way of a recoupment.

Since there are still factual disputes to be resolved, we will direct a remand to the Law Division for reconsideration of the issue of the Trump defendants' liability. As there was no proof of participation in the transaction on the part of Atlantic City

Seashore 2, Inc. and Trump Plaza Corp., we affirm the dismissal as to these defendants. As to the SSG defendants, we remand this matter to the Law Division with a direction that judgment be entered against them in favor of plaintiff, with interest from the date of closing. We do not retain jurisdiction.